## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

A.M., an individual,            :

                          :    **Case No. 2:22-cv-3797**

     **Plaintiff,**        :

                          :    **Chief Judge Algenon L. Marbley**

     **v.**                   :

                          :    **Magistrate Judge Elizabeth P. Deavers**

**WYNDHAM HOTELS & RESORTS,**  :
**INC.,** *et al.,*             :

                          :

     **Defendants.**      :

### OPINION & ORDER

This matter is before this Court on Defendant Wyndham Hotels & Resorts, Inc.'s ("Wyndham") Motion to Dismiss, Transfer, or Motion for Interlocutory Certification. (ECF No. 27). For the following reasons, Defendant's Motion is hereby **DENIED.**

### I. BACKGROUND

This case arises under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a) and the Child Abuse Victim's Rights Act ("CAVRA"), 18 U.S.C. § 2255. Plaintiff A.M. alleges she was kidnapped at age sixteen and trafficked for sex at the Wyndham branded Inglewood Days Inn, Buena Park Days Inn, Lawndale Days Inn, El Segundo Travelodge, and San Diego Super 8 between 2010 and 2016. (ECF No. 1 ¶¶ 44, 59). Plaintiff alleges Defendant "profited from each and every room that A.M.'s traffickers and customers rented where A.M. was harbored and maintained for the purpose of sex trafficking" and from Wi-Fi data collected from the rooms. (*Id.* ¶ 123). She also alleges that "to save costs and continually reap millions of dollars in profits, Defendant[] generally failed to create, adopt, implement, and enforce company-wide

policies and procedures regarding suspected incidents of human trafficking at the branded properties." (*Id.* ¶ 39).

According to A.M., each stay at the Wyndham branded properties raised "several consistent red flags," that should have been obvious to staff, "including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting rooms away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors going in and out of A.M.'s room; Physical abuse in public spaces; Visible signs of prior/private physical abuse; Asking the front desk not to be disturbed; Women wearing clothing inappropriate for the weather; Living out of the hotel room; and Loud noises of abuse or other violence audible to staff and/or other rooms." (*Id.* ¶ 63, 70, 79, 88, 99). On one occasion at the Inglewood Days Inn, an employee entered the room while A.M.'s trafficker was beating her, but quickly left the room instead of responding to A.M.'s pleas for help. (*Id.* ¶ 59). At that same location, A.M. recalls being forced to solicit customers in the parking lot while wearing lingerie. (*Id.* ¶ 60). At another location, A.M. was beaten by one her traffickers while naked, and fled the room, unclothed. (*Id.* ¶ 68). And at yet another location, staff openly acknowledged that they knew what A.M. and her traffickers were "doing there" but would succumb to bribes from A.M.'s traffickers to provide rooms. (*Id.* ¶ 84). Plaintiff also explains that her trafficker used the hotel's Wi-Fi to post advertisements for the sale of her body and communicate with "johns." (*Id.* ¶ 49).

Plaintiff now seeks to hold Defendant Wyndham liable as a beneficiary of its participation in a commercial venture that it knew, or should have known, violated the TVPRA. Plaintiff commenced this action in October 2022. (ECF No. 1). In June 2023, Defendant filed a Motion to

Dismiss. (ECF No. 27). Plaintiff has responded, and Defendant replied. (ECF Nos. 39; 42). The Motion is now ripe for review.

## II. LAW & ANALYSIS

### A. Personal Jurisdiction

As a threshold matter, Defendant contends that this Court cannot exercise personal jurisdiction over it because, in Defendant's view, Plaintiff has failed to state a claim under CAVRA, which authorizes a Plaintiff to bring suit in any appropriate United States District Court. (ECF No. 27 at 7-13). Because Wyndham is located in New Jersey and the properties in question are located in California, Defendant asserts that absent a CAVRA claim, this Court has no personal jurisdiction over it and must dismiss the case. (*Id.* at 8-9). Plaintiff argues that she has indeed stated a claim under CAVRA, and even if she has not, Defendant has consented to jurisdiction in Ohio by appointing a registered agent for service of process here. (ECF No. 39 at 16-25). To determine whether this Court possesses personal jurisdiction over the Defendant, this Court must first analyze whether Plaintiff has stated a CAVRA claim.

### 1. Standard of Review

This Court may dismiss a cause of action under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F. 3d 950, 958–59 (6th Cir. 2005). This Court must construe the complaint in the light most favorable to the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F. 3d 430, 434 (6th Cir. 2008). If more than one inference may be drawn from an allegation, this Court must resolve the conflict in favor of the

plaintiff. *Mayer v. Mylod*, 988 F. 2d 635, 638 (6th Cir. 1993). This Court cannot dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* The Complaint should also be read as a whole, even if a specific alleged fact read in isolation appears meaningless. *Ricchio v. McLean*, 853 F.3d 553, 557 (1st Cir. 2017).

2.  *Liability Under the Child Abuse Victims Rights Act, 18 U.S.C. § 2255(a)*

Plaintiff seeks to hold Defendant liable under the Child Abuse Victims Rights Act, 18 U.S.C. § 2255(a) ("CAVRA"). Under CAVRA:

> Any person who, while a minor, was a victim of a violation of section . . . 1591 [among others] . . . and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.

§ 2255(a).

At the outset, Defendant argues that Plaintiff has failed to allege that she was indeed a minor at the time that she was trafficked through Defendant's branded properties. (ECF No. 27 at 10). Not so. Plaintiff alleges that she was sixteen when she was kidnapped and that she was shuttled between various hotel properties, including Defendant's, for six years. (ECF 1 ¶ 44, 49). In her complaint, she does not mention other subsequent periods of trafficking, and alleges that she "was a 'person' who 'has not attained the age of 18 years' pursuant to 18 U.S.C. § 1591(a)(2)." (*Id.* ¶ 177). A complaint "must be read 'as a whole,' and all reasonable inferences must be drawn in the plaintiff's favor." *Stratton v. Portfolio Recovery Assocs.*, LLC, 770 F.3d 443, 446 (6th Cir.

2014), *as amended* (Dec. 11, 2014). It is patently reasonable to infer from Plaintiff's complaint that she was a minor at the time she was trafficked at Defendant's properties.

Defendant next argues that the plain language of CAVRA requires Defendant itself to have violated § 1591, the portion of the TVPRA that creates criminal liability for those knowingly engaged in or knowingly benefitting from sex trafficking. (ECF No. 27 at 9-13). In Defendant's view, Plaintiff's CAVRA claim must fail because § 1591 requires actual knowledge, as opposed to the constructive knowledge sufficient for its civil counterpart, § 1595, and an "overt act." (*Id.* at 10-12; 42 at 2-5). Plaintiff responds that this Court already concluded that she has stated a CAVRA claim when it issued its earlier Opinion & Order on venue, establishing the law of the case. (ECF No. 39 at 16-17). Defendant points out, however, that at the time of the earlier opinion, Defendant had not yet been served and given the opportunity to fully brief the issue. (ECF No. 42 at 2). Because Defendant did not have a full opportunity to litigate whether Plaintiff states a CAVRA claim, this Court considers the issue anew.

This Court's analysis begins and ends with the text of the statute.[1] As this Court and others have observed before, § 2255 does not specify against whom a lawsuit may be brought. *Jane Doe No. 8 v. Royal Caribbean Cruises, Ltd.*, 860 F. Supp. 2d 1337, 1339 (S.D. Fla. 2012) (concluding that a cruise line could be held liable under § 2255 for the sexual crimes of its employees). In light of that silence, the Court is guided by one of the most familiar canons of statutory

---

[1] It is worth noting that, on different briefing, this Court concluded that a similarly situated plaintiff sufficiently alleged a § 2255 claim on the theory that the plaintiff could show that the defendant itself, Wyndham Hotels, violated § 1591, the criminal portion of the TVPRA, by a preponderance of the evidence. *T.E. v. Wyndham Hotels & Resorts, Inc.*, 2023 WL 5531441, at *10 (S.D. Ohio Aug. 28, 2023). When *T.E.* was decided, the interpretation of § 2255 above had not been argued to this Court. Given that this is a developing area of the law, and the Parties' arguments have evolved accordingly, this Court is now better positioned to analyze the issue and finds the above interpretation persuasive.

interpretation: "courts may not add or subtract words from a statute." *Id.* By asking this Court to conclude that only perpetrators can be held liable, Defendant "effectively asks this Court to re-write the statute by inserting (after 'may sue') the words 'the offender' or 'the perpetrator.'" *Id.* at 1340. Congress has added similar language in analogous scenarios, and could have done so here, had it intended to limit liability to the criminal perpetrator. *Id.* As this Court's reads it, the absence of a grammatical object in § 2255(a) is conspicuous and, therefore, likely intentional.[2] The text provides no reason to believe that Congress intended to prohibit plaintiffs from suing beneficiaries of and participants in the many crimes enumerated in § 2255, so long as plaintiffs' claims comport with the traditional requirements of standing—injury in fact, causation, and redressability.[3]

Here, Plaintiff has sufficiently alleged that she was injured when she was trafficked in violation of § 1591 as a minor. Defendant's alleged participation in and benefit from a venture it should have known was in violation of the TVPRA, discussed further below, is surely enough to establish causation for purposes of a standing analysis. *See Rieves v. Town of Smyrna, Tennessee*, 67 F.4th 856, 862 (6th Cir. 2023) (holding that "the plaintiff need not prove that the defendant was the sole cause of his injury as long as harm is a 'predictable effect' of the defendant's actions on the decisions of third parties."). And Plaintiff's harm is one a court can redress through damages.

---

[2] This Court acknowledges, as it has before, *In re Hotel TVPRA Litigation*, 2023 WL 3075851, at *6, that a House Report from 1998 indicates that "[i]t is the intention of the Committee that only the offender who perpetrated the offense against the minor is liable for damages under this section." H.R. REP. 105-557, 23 (1998). But the text of the statute is the ultimate reflection of Congress's intent. Congress has revised § 2255 several times and not seen fit to add language specifying that only offenders or perpetrators of the criminal predicate may be liable, despite an apparent awareness of the issue.

[3] The fact that § 2255 is silent as to vicarious liability does not undercut this conclusion as Defendant suggests. (ECF No. 27 at 12). Congress's repeated silence as to persons liable is much more conspicuous than its silence as to vicarious liability, and indeed supports the availability of vicarious liability.

Accordingly, this Court concludes that Plaintiff has pleaded sufficient allegations to survive a motion to dismiss on her CAVRA claim.

3.    <i>Consent</i>

Because this Court concludes that Plaintiff has stated a CAVRA claim, which authorizes nationwide personal jurisdiction, it need not consider whether Defendant has consented to personal jurisdiction through appointing a registered agent for service of process in Ohio.

**B.  Service**

Defendant also moves to dismiss for insufficient service of process under Federal Rule of Civil Procedure 12(b)(5), pointing out that Rule 4(m) requires that a defendant be served within 90 days of a complaint being filed.  (ECF No. 27 at 27).  Plaintiff filed this action on October 24, 2022, and Defendant was not served until May 1, 2023.  (ECF No. 20 at 2-3).  But this Court already held, with respect to another similarly-situated Defendant, that Plaintiff has "shown cause why Plaintiff's claims should not be dismissed for failure to perfect service within the time allowed by Rule 4(m)."  (ECF No. 19).  This court sees no reason to reach a different conclusion with respect to Wyndham.

**C.  Venue Transfer Pursuant to 28 U.S.C. § 1404**

Defendant next argues that this Court should transfer venue pursuant to 28 U.S.C. § 1404, which grants a district court broad discretion to transfer a civil action to a more convenient forum, even where venue is proper where the case was filed.  (ECF No. 27 at 13-15).  Plaintiff responds that this Court already concluded in its earlier Opinion & Order that venue was "properly laid in this District," and it declined to "exercise its discretionary power to transfer the cases to a different district court pursuant to § 1404," following a lengthy analysis.  (ECF No. 15 at 17, 27-41).  While

true, as discussed above, that Defendant had not been served at the time that this Court reached its venue conclusion, Plaintiff contends that because Defendant fails to raise any arguments that have not already been considered, this Court should adhere to its earlier holding. (ECF No. 39 at 41-45). Even though Defendant's opportunity to weigh in on the issue of venue at that juncture was limited, counsel for Defendant appeared at the relevant hearing and made arguments to this Court. (ECF No. 14 at 5-17). This Court also explicitly considered this case and those like it in its Opinion & Order. (ECF No. 15 at 39-40, n.22). This Court has now reviewed Defendant's briefing and finds no arguments that warrant rehashing of its earlier analysis regarding discretionary transfer under § 1404; it incorporates that analysis here. If its earlier Opinion & Order was not the law of the case with respect to Wyndham before, it is going forward.

### D. Direct Civil Liability Under the TVPRA § 1595

Having concluded that there are no jurisdictional impediments to adjudicating this case, and that Plaintiff has stated a claim under § 2255, this Court now considers whether Plaintiff has stated a claim under the civil liability component of the TVPRA, § 1595. This Court has undertaken extensive analysis of the issue of civil liability of hotel defendants in sex trafficking cases under the TVPRA in several cases with many factual similarities to this one. *See e.g., T.P. v. Wyndham Hotels & Resorts, Inc.*, No. 2:21-cv-04933, 2022 WL 17363234 (S.D. Ohio Dec. 1, 2022); *A.C. v. Red Roof, Inc.*, No. 2:19-cv-4965, 2020 WL 3256261 (S.D. Ohio Jun. 16, 2020); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:10-cv-1194, 2020 WL 1244192 (S.D. Ohio Mar. 16, 2020); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019); *H.H. v. G6 Hospitality, LLC*, No. 2:19-cv-755, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019).

8

The TVPRA has two provisions relevant to this case. First, the TVPRA provides for criminal penalties set forth in 18 U.S.C. § 1591:

> (a) Whoever knowingly—
>
> (1) in or affecting interstate or foreign commerce, . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
>> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a). Secondly, and central to Plaintiff's claim, is the standard for civil liability under the TVPRA set forth in 18 U.S.C. § 1595:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).

As a preliminary matter, this Court has held in several cases that § 1595(a) can be a standalone claim, and civil defendants need not have committed the underlying criminal sex trafficking offense under § 1591. *M.A.*, 425 F. Supp. 3d at 964; *H.H.*, 2019 WL 6682152 at *2 (citing Cong. Research Serv., R40190, The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (P.L. 110-457): Criminal Law Provisions, at 16 (Jan. 29, 2009) (the amendments to the TVPRA "create[ ] civil liability both for those who face criminal liability for

their profiteering and those who do not.")); *Plaintiff A v. Schair*, No. 2:11-cv-00145-WCO, 2014 WL 12495639, at *3 (N.D. Ga. Sept. 9, 2014) (the 2008 amendments broadened the parties who could be sued for trafficking violations from only the perpetrator)). This Court likewise finds that Plaintiff's allegation that she is a victim of trafficking under § 1591 is enough to plead sufficiently that she is "a victim of this chapter" pursuant to § 1595(a) in order to survive a motion to dismiss. (ECF No. 1 ¶¶ 20, 169).

This Court analyzes Plaintiff's direct civil liability claim under the "beneficiary theory" of § 1595(a). The Plaintiff must plead the following in order to survive a Motion to Dismiss under this theory: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value"; (2) from participating in a venture; (3) that the "person knew or should have known has engaged in an act in violation of this chapter." § 1595(a). A plaintiff may satisfy these elements by showing that "defendant's own acts, omissions, and state of mind establish each element." *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1060 (D. Colo. 2021).

*1. Knowing benefit*

Plaintiff has sufficiently alleged that Defendant "knowingly benefited" financially from a venture in violation of the TVPRA. Plaintiff alleges that Defendant profited in two ways: (1) through renting rooms to Plaintiff's traffickers; and (2) "from gathering personal data from the Wi-Fi it provided to customers." (ECF No. 1 ¶ 24(d)).

This Court found in *M.A.*, *H.H.*, and *T.P.* that "the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard." *M.A.*, 425 F. Supp. 3d at 965; *H.H.*, 2019 WL 6682152 at *2. *See also J.L.*, 521 F. Supp. 3d at 1061 (concluding that allegations that a hotel defendant received a percentage of room

10

revenue where trafficking occurred, was sufficient to meet the knowingly benefited element under 18 U.S.C. § 1595(a)); *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112, 1137 (D. Colo. 2019) (finding the forced labor provision of § 1589(b) does not "require[ ] the party to benefit from the [forced] labor or services for liability to attach"). The same conclusion applies here.

Plaintiff's contention that Defendant knowingly benefited from "gathering personal data" from Wi-Fi, however, fares worse. Plaintiff fails to allege that Defendant benefitted financially or received "anything of value" as is required by § 1595(a). Plaintiff makes no effort to explain how this data benefitted Defendant. Accordingly, Plaintiff has failed to plead allegations sufficient to proceed under a theory of benefit through Wi-Fi data.

### 2. Participation in a venture

Plaintiff has also alleged sufficient facts to demonstrate Defendant's conduct constituted "participation in venture" under § 1595(a). This Court has held that participation in a venture under § 1595 does not require actual knowledge of trafficking crimes but requires "at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." *M.A.*, 425 F. Supp. 3d at 970 (citing *Jean-Charles*, 937 F. Supp. 2d at 288–89); *see also G.G. v. Salesforce.com, Inc.*, 76 F.4th 544 (7th Cir. 2023) (holding that "the relevant 'venture'" under Section 1595 need not be 'specifically a sex trafficking venture'" and can be a "'commercial venture[]' like running or expanding a business."); *Ricchio*, 853 F.3d at 555 (finding sufficient allegations that, among other things, the trafficker and hotel owner had prior dealings); *Doe S.W.*, 2020 WL 1244192, at *6–7 (finding allegations that defendant hotels repeatedly rented rooms to individuals they should have known were traffickers based on the

11

totality of the circumstances, were sufficient to survive a Rule 12(b)(6) motion); *H.H.*, 2019 WL 6682152, at *4 (same); *A.C.*, 2020 WL 3256261, at *6 (same). Further, participation in a venture under § 1595 does not require an "overt act." *See e.g., J.L.*, 521 F. Supp. 3d at 1062; *E.S. v. Best W. Int'l Inc.*, 510 F. Supp. 3d 420, 427 (N.D. Tex. 2021); *M.A.*, 425 F. Supp. 3d at 968–69; *S.J.*, 473 F. Supp. 3d at 153–54; *Doe S.W.*, 2020 WL 1244192, *6; *J.C. v. Choice Hotels Int'l, Inc.*, 2020 WL 3035794, at *1 n. 1 (N.D. Cal. June 5, 2020).

Plaintiff asserts that because Defendant "owned, supervised, managed, controlled, and/or operated" the properties at which she was trafficked, it therefore had a continuous business relationship with the franchisee who rented her traffickers rooms there. (ECF No. 39 at 29-30). Plaintiff alleges that Defendant exerted this control over the property through myriad means including providing reservation platforms, providing training to employees, providing customer review platforms, and implementing standardized rules of operation. (ECF No. 1 ¶¶ 137-38). Defendant counters that the hotels are subject to franchise agreements and are owned and operated by third parties removed from Defendant's control. (ECF No. 27 at 18-19). It argues that Plaintiff fails to connect Defendant to a venture that violated § 1591(a) beyond the existence of the franchisor-franchisee relationship. (*Id.*). Additionally, Defendant argues that its failure to prevent sex trafficking cannot constitute "participation." (*Id.* at 16-17).

First, this Court addresses whether a franchisor-franchisee relationship between Defendant and the hotel operators is too attenuated to support Plaintiff's claim. Defendant points to the Eleventh Circuit's decision, *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021), which this Court has analyzed several times before. *See e.g., T.P.*, 2022 WL 17363234, at *10-11. In *Doe #1*, the complaint included allegations that: (1) defendants licensed their brand to franchisees

12

who paid royalties to the defendants and other fees based on a percentage of their room revenue; (2) defendants received a percentage of the revenue generated from the rooms in which trafficking occurred; (3) defendants "owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms" at these hotels; (4) defendant franchisors investigated incidents of trafficking at the individual hotels and controlled training related to spotting trafficking; and (5) read online reviews mentioning prostitution and crime occurring generally at the hotels where plaintiffs were trafficked. *Doe #1*, 21 F.4th at 726. On these facts—admittedly similar to the ones *sub judice*—the Eleventh Circuit concluded that plaintiffs failed to allege that "the franchisors participated in a common undertaking involving risk or profit that violated the TVPRA." *Id.* at 726–27.

But "[k]ey to the court's reasoning" in *Doe #1* "was how the plaintiffs had chosen to define the alleged venture—specifically as a '*sex trafficking*' venture." *G.G.*, 76 F.4th at 561-62 (emphasis added). Here, Plaintiff alleges that Defendant was engaged in business ventures at the property where Plaintiff was trafficked, not that Defendant participated in sex trafficking themselves. (ECF No. 1 ¶ 24(d)). This critical distinction limits *Doe #1*'s relevance here. *See G.G.*, 76 F.4th at 562. The alleged venture "need not be 'specifically a sex trafficking venture.'" *Id.* at 554. Instead, it can "be a business whose primary focus is not on sex trafficking." *Id.* In *G.G.*, for example, plaintiffs alleged that the defendant, Salesforce, provided advice and software to Backpage, a now-defunct website that hosted advertisements posted by the minor plaintiff's street-level trafficker. *Id.* at 548. The Seventh Circuit concluded that the venture there "was Backpage's business itself, including the 'growth,' 'expansion,' and profitability of that business."

*Id.* at 554. Salesforce's relationship with Backpage certainly fell within the ambit of its typical business activities, much like Defendant's.

Defendant's argument that it at most observed trafficking, as opposed to participating in it, is similarly unpersuasive. (ECF No. 27 at 16-17). It complains that Plaintiff is seeking to impose on it an affirmative duty to seek out and prevent trafficking. (*Id.* at 16). As Plaintiff points out, though, she does not allege mere observation coupled with a failure to intervene. This is not an attempt at bystander liability. Instead, she alleges that the Defendant "violated the duty established by the TVPRA: to refrain from 'knowingly benefit[ing] from 'participation in a venture' that Defendant[] knew or should have known violated § 1591." (ECF No. 39 at 31). Specifically, Plaintiff alleges that Defendant: (1) profited from the rooms her traffickers rented and failed to implement trafficking prevention training programs; (2) collected room reservation, identification, payment, and sex trafficking website data from the trafficker's use of hotel Wi-Fi; and (3) had expansive control over franchisee policies and operations but did not use that power to hold the franchisees accountable. (ECF No. 1 ¶¶ 13, 39, 125, 136-146).

This Court finds that Plaintiff's allegations that Defendant profited, failed to implement policies, and maintained expansive control over the hotel operation standards meet § 1595's definition of "participation in a venture." Here, Defendant was involved in a business venture with the franchisee hotels, and both groups benefitted by renting rooms to traffickers despite having at least constructive knowledge of ongoing trafficking based on the totality of the circumstances.

Of note, Plaintiff incorrectly argued in her response that Defendant's actions meet § 1591(e)(4)'s definition of "participation in a venture." In *M.A.*, this Court ruled that the definition

14

of "participation in a venture" from § 1591(e)(4) was not applicable to § 1595 because it would inappropriately import a knowledge standard absent in § 1595.[4] 425 F.Supp.3d at 969.

### 3. Knew or should have known the venture violated the TVPRA

A defendant cannot be liable under 18 U.S.C. § 1595(a) unless it "knew or should have known" that the venture from which it benefitted "has engaged in an act in violation of" the TVPRA. Defendants need not have actual knowledge of trafficking crimes for liability to attach, as the language of § 1595(a) demonstrates that constructive knowledge is sufficient. *M.A.*, 425 F. Supp. 3d at 970 (citing *Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 288–89 (D. Conn. 2013)).

Defendant contends that a generalized awareness of sex trafficking in hotels is insufficient to hold it liable; in Defendant's view, Defendant must have actual or constructive knowledge of Plaintiff's trafficking specifically. (ECF No. 27 at 20-23). Plaintiff responds: (1) that there were signs of Plaintiff's trafficking that ought to have been obvious to hotel staff; and (2) that Defendant, and the hospitality industry more broadly, has long been aware of the prevalence of human trafficking at their properties but (3) failed to take action regarding human trafficking.

This Court has previously held that notice of "the prevalence of sex trafficking generally at their hotels," the failure "to take adequate steps to train staff in order to prevent its occurrence," and signs that "should have alerted staff to [Plaintiff's] situation" are sufficient to meet the constructive knowledge requirement. *M.A.*, 425 F. Supp. 3d at 968. Seeing similar allegations in the case at hand, this Court reaches the same conclusion.

---

[4] In that case, plaintiff's counsel, who also represents Plaintiff in this case, argued as much. While this oversight is not detrimental to Plaintiff's allegations, Plaintiff's Counsel is again reminded to review this Court's past rulings as they represent this Court's interpretation of the TVPRA.

This Court is guided in its analysis by two cases that establish the spectrum on which civil liability under the TVPRA can be found. In *Ricchio v. McLean*, the plaintiff alleged that the hotel owner and the trafficker were working together in a sex trafficking scheme evidenced by a "high-five" while discussing "getting this thing going again," a past business relationship between the two, and allegations that one of the hotel owners had gone to the victim's room and "had shown indifference to [plaintiff's] obvious physical deterioration." *Ricchio*, 853 F. 3d at 555. Plaintiff alleged that while "in plain daylight view of the front office of the motel," her trafficker "kick[ed] her and force[d] her back toward the rented quarters when she had tried to escape." *Id.* The Court concluded that the defendants "acted, at least, in reckless disregard" of the nature of the venture for purposes of § 1589 and § 1595. *Id.* at 557.

Conversely, in *Lawson v. Rubin*, plaintiffs sued Blue Icarus, the owner of a condo that it leased to Howard Rubin who was procuring women who he then sexually assaulted and abused at that location. No. 1:17-cv-6404 (BMC), 2018 WL 2012869, at *2 (E.D.N.Y. Apr. 29, 2018). The court found the plaintiff's allegations of one police visit after a fight ensued and one ambulance sent to the residence in six years insufficient to hold Blue Icarus liable under § 1595. The Court reasoned that even if Blue Icarus had done further investigation following the incidents, it would not have uncovered any more information about the alleged trafficking. *Lawson*, 2018 WL 2012869, at *13–14.

Plaintiff's allegations fall closer to *Ricchio* than to *Lawson*. Hotel staff were privy to a host of horrors visited upon A.M. by her traffickers while they stayed at Wyndham branded properties, including witnessing physical abuse and accepting bribes to look the other way about A.M.'s trafficking. (ECF No. 1 ¶¶ 59, 60, 68, 84). Plaintiff also alleges that her stays at Wyndham

16

properties produced repeated "red flags," including payment in cash, extended stays paid for on a day-to-day basis, large numbers of male visitors, and audible signs of distress during conflict between Plaintiff and her traffickers.  (*Id.* ¶¶ 63, 70, 79, 88, 99).  This Court has previously concluded that many aspects of Plaintiff's experience should have alerted staff to her trafficking, including excessive condoms, cash payments from her traffickers, and frequent male guests. *See M.A.*, 425 F. Supp. 3d at 967; *see also T.P.*, 2022 WL 17363234, at *8-9.

With respect to Wyndham as franchisor, Plaintiff's allegations are sufficient to pass muster under the plausibility standard of a 12(b)(6) motion to dismiss because she alleges that the franchisor itself had constructive knowledge of the problem.  In comparable environments, courts have found failure to implement policies sufficient to combat a known problem in one's operations constitutes willful blindness or negligence.  *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 758–79 (1998) (holding where a "supervisor's sexual harassment is outside the scope of employment because the conduct was for personal motives," an employer can still "be liable . . . where its own negligence is a cause of the harassment" because it "knew or should have known about the conduct and failed to stop it"); *Brown v. Corr. Corp. of Am.*, 603 F. Supp. 2d 73, 81 (D.D.C. Mar. 26, 2009) (finding that complaint stated sufficient allegations under § 1983, based on willful blindness, where defendants knew that a supervisor at a correctional facility raped his employee, sexual harassment at the facility "was not an isolated incident," and defendants failed "to implement and effectuate the appropriate policies . . . to remedy and/or prevent the discriminatory conduct, sexual abuse and sexual harassment and rape").

Defendant contends that it must have had knowledge or constructive knowledge with respect to Plaintiff specifically and that a generalized awareness of sex trafficking in its low-cost

hotels is insufficient. (ECF No. 27 at 21-23).  But the express terms of the statute impose liability for benefiting from a venture that the Defendant knew or should have known was engaged in violations of § 1591, not violations of § 1591 with respect to a particular person. § 1595.

The facts specific to Plaintiff's own sex trafficking, in combination with her allegations that Defendant was on notice about the prevalence of sex trafficking at its hotels yet continued to rent rooms to traffickers and failed to take adequate steps to train staff in order to prevent its occurrence, together support a conclusion that Defendant had constructive knowledge of the trafficking occurring at their hotels because they "should have known" about the nature of the venture under the beneficiary theory's negligence standard.  § 1595.  *See T.P. v. Wyndham Hotels & Resorts, Inc.*, 2022 WL 17363234, at *9 (S.D. Ohio Dec. 1, 2022) (reaching the same conclusion).  Therefore, this Court finds that Plaintiff's allegations are sufficient to meet the negligence standard in § 1595 for purposes of surviving this Motion to Dismiss.

Because Plaintiff's allegations meet the three-pronged requirement of 18 U.S.C. § 1595, Plaintiff has sufficiently stated a claim that Defendant is directly, civilly liable under the TVPRA. *See M.A.* 425 F. Supp. 3d at 971–72 (denying motion to dismiss of hotel parent company defendants where plaintiff pled that defendants controlled employee training, room pricing, provided online booking platform, and conducted inspections).

### E.  Joint and Several Liability

Plaintiff argues that all Defendants are jointly and severally liable for her damages under the TVPRA. (ECF No. 1 ¶ 43).  Defendants do not appear to respond to this argument.  Therefore, this Court will consider Defendants to have conceded this point.

18

### F. Vicarious Liability

A plaintiff can also satisfy the elements of § 1595's beneficiary theory by imputing "to the defendant the acts, omissions, and state of mind of an agent of the defendant" through indirect or vicarious liability. *J.L.*, 521 F. Supp. 3d at 1060. The TVPRA, however, does not address the issue of indirect or vicarious liability; therefore, federal district courts that have adjudicated this issue must apply common law to fill in the gaps. *Norfolk Redevelopment and Hous. Auth. v. Chesapeake and Potomac Tel. Co. of Va.*, 464 U.S. 30, 35–36 (1983) (explaining that the traditional rules of statutory construction advise that statutes are presumed not to disturb the common law "unless the language of the statute [is] clear and explicit for this purpose."); *see also In re Nicole Gas Prod., Ltd.*, 581 B.R. 843, 850 (B.A.P. 6th Cir. 2018), *aff'd sub nom., Nicole Gas Prod., Ltd.*, 916 F.3d 566 (6th Cir. 2019) (explaining that statutes are presumed to embrace the common law extant at their enactment). In the past, this Court, and other district courts, have applied the state common law of vicarious liability when addressing indirect liability arguments under the TVPRA. *M.A.*, 425 F. Supp. 3d at 971 (applying Ohio agency law); *see also A.B.*, 455 F. Supp. 3d at 194–95 (applying Pennsylvania agency law); *S.J.*, 473 F. Supp. 3d at 158–59 (applying New York agency law). Since this Court's ruling in 2019, another district court chose to apply the federal common law of vicarious liability in a TVPRA case. *A.B.*, 484 F. Supp. 3d at 939–40 (citing Ninth Circuit cases where the court applied the federal common law of agency when the federal statute did not otherwise provide direction).

As this Court has previously outlined, the Sixth Circuit has yet to rule on whether the federal or state common law of vicarious liability should be applied under the TVPRA. While this Court has previously entertained arguments for both given the nearly identical analysis required

under federal and Ohio common law, this Court will proceed under a federal common law analysis of the issue. This approach brings the analysis in line with the Sixth Circuit's approach to applying the federal common law of vicarious liability to federal statutes that do not expressly provide direction on vicarious liability arguments. *See e.g., Marr v. Rife*, 503 F.2d 735, 740–41 (6th Cir. 1974) (explaining that in determining the extent of liability of the owner of a real estate agency for violations of Fair Housing Act by his agent, court should apply federal law and should not be restricted by respondeat superior law or law of vicarious liability of the various states); *Keating v. Peterson's Nelnet, LLC*, 615 Fed. App'x 365, 371–72 (6th Cir. 2015) (citing *In the Matter of Dish Network, LLC*, 28 FCC Rcd. 6574, 6584 (May 9, 2013)) (explaining that the FCC concluded that defendants may be held vicariously liable for statutory violations under federal common law agency principles, including apparent authority and ratification) *but cf. Pension Benefit Guar. Corp. v. Findlay Indus., Inc., et al.*, 902 F.3d 597, 611 (6th Cir. 2018) (deciding to apply state common law to an ERISA contract dispute regarding successor liability because a federal court may take direction from "the law of the state in which it sits" so long as the standard used "best comports with the interests served by ERISA's regulatory scheme," but explaining that "as a general matter, the court must look to the federal common law and should draw guidance from state common law only when federal common law does not provide an established standard").

### 1. Agency

The Sixth Circuit relies on the Restatement of Agency when applying the federal common law of vicarious liability. *Johansen v. HomeAdvisor, Inc.*, 218 F.Supp.3d 577, 586 (S.D. Ohio 2016). Agency is most commonly defined as the "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the

principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) of Agency* § 1.01 (2006). A defining element of agency "is the principal's right to control the agent's actions" such as "[t]he power to give interim instructions." *Id.* at cmt. f (1); *see also Savanna Group, Inc. v. Trynex, Inc.*, No. 10-C-7995, 2013 WL 4734004, at *5 (N.D. Ill. Sept. 3, 2012) (explaining that "[t]he power to give interim instruction" is an element that "distinguishes principals in agency relationship from those who contract to receive services provided by persons who are not agents."). As a result of that power, "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment." *Burlington Indus. Inc.*, 524 U.S. at 755–56 (1998) (quoting *Restatement (Second) of Agency* § 219(1) (1957)).

While the mere existence of a franchise does not establish an agency relationship, the franchise model also does not preclude wholesale franchisors from vicarious liability under an agency theory. *Bricker*, 804 F.Supp.2d at 623 ("[T]he existence of a franchisor-franchisee relationship between persons does not in itself *preclude* the existence of a principal-agent relationship between them."). To determine whether "a principal-agent relationship exists, courts consider the same factors 'as in the absence of a franchisor-franchisee relationship.'" *Id.* (citing *Taylor v. Checkrite, Ltd.*, 627 F. Supp. 415, 416 (S.D. Ohio 1986)). To succeed under an agency theory, Plaintiff must show both: (1) that Defendant and its franchisees were in an agency relationship; and (2) that hotels or hotel staff are plausibly liable under § 1595(a).

Plaintiff alleges that Defendant exercised day-to-day control over the franchise property at issue here. (ECF No. 1, ¶¶ 131-46). Plaintiff argues that this includes requiring franchisees to, among other things: (1) use Wyndham's property management system; (2) submit to periodic

21

inspections; (3) gather reservation, payment, and occupancy data through Wyndham's centralized system; (4) use approved Wi-Fi and security vendors; (5) comply with Wyndham's regulated room rental rates; and (6) adhere to other brand standards and corporate policies with respect to ethics and safety. (*Id.*). These allegations are sufficient to meet the pleading standards of Federal Rule of Civil Procedure 8 to demonstrate Defendant's control over the franchisee properties for purposes of an agency relationship and vicarious liability.[5]

And Plaintiff alleges that the hotel franchisees themselves committed a wrong that can be imputed on Defendant. *See J.L. v. Best W. Int'l Inc.*, 521 F. Supp. 3d 1048, 1064-65 (D. Colo. 2021). This Court applies the three-pronged test established by 18 U.S.C. § 1595—and already used to assess Defendant's direct liability—to the hotel franchisees as well: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value"; (2) from participating in a venture; (3) that the "person knew or should have known has engaged in an act in violation of this chapter." § 1595(a).

First, Plaintiff alleges that the franchisees rented rooms to traffickers and financially benefited from their trafficking ventures, therefore satisfying the first prong. (ECF No. 1 ¶ 22(d)). Second, Plaintiff has alleged sufficient facts—that franchisee hotels, along with Defendant, benefited financially from renting rooms to traffickers and should have known trafficking was going on based on the totality of the circumstances—to meet § 1595's definition of "participation in a venture" in a commercial setting that profited from Plaintiff's sex trafficking. (*Id.*). Plaintiff alleged sufficient facts to demonstrate that employees at the hotel had constructive knowledge that

---

[5] To the extent that Defendant argues that it does not in fact control the locations in question, (ECF No. 27 at 23-26), and points to the franchise agreement, (ECF No. 42 at 7), those contentions challenge evidence, not the sufficiency of Plaintiff's allegations.

she was being trafficked; specifically, that staff would have seen many red flags pointing toward trafficking and signs of Plaintiff's physical deterioration and abuse. (*Id.* at ¶ 77, 85, 93, 99). Therefore, the beneficiary theory is satisfied with respect to Defendant's franchisees.

### 2. Joint Employer Status

Plaintiff argues in her Response that she alleges a second independent theory of vicarious liability through "joint employment" of hotel staff. Much like agency theory, whether two employers are a joint employer also often turns on how much control one exercises over the other. *See e.g.*, *Int'l Longshoremen's Ass'n, AFL-CIO, Local Union No. 1937 v. Norfolk Southern Corp.*, 927 F.2d 900, 902 (6th Cir. 1991) (articulating test for joint employer status under the NLRA as "the interrelation of operations between the companies, common management, centralized control of labor relations, and common ownership."); *Sanford v. Main Street Baptist Church Manor, Inc.*, 327 Fed. App'x 587, 594 (6th Cir. 2009) (adopting the following test for Title VII joint employer status: "(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work; (2) the kind of occupation and nature of skill required, including whether skills are obtained in the work place; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations; (4) method and form of payment and benefits; and (5) length of job commitment and/or expectations."). "While the factors this Court must consider when analyzing both agency and joint employer theories of vicarious liability are very similar, important among those to establish a joint employer theory of vicarious liability is the control exercised by the franchisor specific to employment policies." *B.D.G.*, 2023 WL 5935646, at *10.

Plaintiff alleges that "Wyndham employees worked throughout the Wyndham Branded California Properties" and that "Wyndham is the employer of the staff at its branded properties." (ECF No. 1 ¶¶ 24(b), 145). Whether Plaintiff's joint employer theory succeeds is a very close call. Ultimately, because Plaintiff alleges that Defendant posts all hotel jobs on its website, controls employee training, and provides employee benefits, she has sufficiently pleaded a joint employer theory against Wyndham. *A.R.*, 2022 WL 17741054, at *11 (finding joint employer theory of vicarious liability sufficiently pleaded where Plaintiff pled that Wyndham promulgated "policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay.").

### G. Interlocutory Appeal

Since this Court denies Defendant's Motion to Dismiss or Transfer on the merits, Defendant requests that this Court certify this Order as eligible for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Specifically, Defendant asks this Court to certify two questions: "(1) whether a plaintiff must adequately allege a violation of 18 U.S.C. § 1591(a) against a defendant in order to state a claim under 18 U.S.C. § 2255 and invoke nationwide service of process"; and "(2) whether a plaintiff must plausibly allege that a defendant knowingly benefited from participating in a venture that violated Section 1591(a) as to the plaintiff and that the defendant had constructive or actual knowledge that the undertaking or venture violated Section 1591(a) as to the plaintiff in order to state a claim under 18 U.S.C. § 1595(a)." (ECF No. 27 27-28).

As this Court laid out in *C.T. v. Red Roof Inns, Inc.*, No. 2:21-CV-05022, 2022 WL 18003292, at *3 (S.D. Ohio Dec. 30, 2022), interlocutory appeals are generally disfavored and are reserved for "exceptional cases." *In re City of Memphis*, 293 F.3d 345, 350 (6th Cir. 2002). As

"[a]ttractive as it may be to refer difficult matters to a higher court for advance decision, such a course of action is contrary to our system of jurisprudence." *U.S. ex rel. Elliott v. Brickman Group Ltd., LLC*, 845 F. Supp. 2d 858, 863 (S.D. Ohio 2012) (quoting *Alexander v. Provident Life & Accident Ins. Co.*, 663 F. Supp. 2d 627, 639 (E.D. Tenn. 2009)). As the Sixth Circuit long has held, the legislative history of § 1292(b) makes it "quite apparent" that the statute should be "sparingly applied," as it is "not intended to open the floodgates to a vast number of appeals from interlocutory orders in ordinary litigation." *Kraus v. Bd. of Cnty. Road Comm'rs*, 364 F. 2d 919, 922 (6th Cir. 1966). A party seeking certification "has the burden of showing exceptional circumstances exist warranting an interlocutory appeal." *Alexander*, 663 F. Supp. 2d at 639.

Under § 1292(b), this Court may certify an interlocutory appeal only when three criteria are satisfied: (1) the "order involves a controlling question of law"; (2) "there is substantial ground for difference of opinion"; and (3) "an immediate appeal from the order may materially advance the ultimate termination of litigation." 28 U.S.C. § 1292(b); *Cook v. Erie Ins. Co.*, 2021 WL 1056626, at *2 (S.D. Ohio Mar. 19, 2021). If any of these factors is absent, the certification cannot issue. Additionally, "doubts regarding appealability should be resolved in favor of finding that the interlocutory order is not appealable." *In re Nat'l Prescription Opiate Litig.*, 2020 WL 3547011, at *1 (N.D. Ohio June 30, 2020) (internal quotation omitted).

"[E]ven where the statutory criteria are met," the Court still retains "broad discretion to deny certification." *In re Transdigm Grp., Inc. Sec. Litig.*, No. 1:17-cv-1677, 2018 WL 11227556 (N.D. Ohio Jan. 30, 2018) (internal quotation omitted). "Ultimately, allowing certification of an interlocutory appeal lies within the discretion of the district court." *Lang v. Crocker Park, LLC*,

No. 1:09-cv-1412, 2011 WL 3297865, at *2 (N.D. Ohio July 29, 2011) (citing *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 47 (1995)).

Defendant argues that both questions on which it seeks certification implicate controlling legal issues and that divergence among district courts on these issues indicate a substantial difference of opinion.  (ECF No. 27 at 29-33).  But they are not the sort of "ephemeral questions of law that might disappear in the light of a complete and final record" for which § 1292(b) was designed.  *Weber v. United States*, 484 F.3d 154, 159 (2d Cir. 2007).  Indeed, the questions seem likely to remain central to Plaintiff's ability to establish Defendant's liability on both of her claims.  To certify the issues for interlocutory appeal now would create delay and expense, in addition to divesting the Sixth Circuit of the opportunity to consider them in light of the "richer factual and legal history" that would be created by allowing the issues to proceed through the "normal channels of appeal."  *Adhikari v. Daoud & Partners*, No. CIV.A. 09-CV-1237, 2010 WL 744237, at *3 (S.D. Tex. Mar. 1, 2010) (declining to certify questions "comprising this Court's holdings under the TVPRA.").  Accordingly, this Court rejects Defendant's request to certify the issues for appeal.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss, Transfer, or Certify for Interlocutory Appeal is hereby **DENIED**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE:  March 29, 2024**

26